**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-00371(BMC)(TAM) |
| | ) | Hon. Brian M. Cogan |
| AL MALIK ALSHAHHI, et al. | ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR JOINT MOTION IN LIMINE TO PRECLUDE EXPERT TESTIMONY FROM MICHAEL HIGGINS, CHRISTOPHER DAVIDSON AND ELIOT KALTER**

WILLKIE FARR & GALLAGHER LLP

Michael Steven Schachter
Randall Wade Jackson
Steven J. Ballew
787 Seventh Avenue
New York, NY 10019-6099
mschachter@willkie.com
(212) 728-8000 (ph)
(212) 728-8111 (fax)

O'MELVENY & MYERS LLP

James A. Bowman (admitted *pro hac vice*)
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
jbowman@omm.com
(213) 430-6000 (ph)
(213) 430-6407 (fax)

*Counsel for Thomas J. Barrack, Jr.*

WINSTON & STRAWN LLP

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
1901 L Street, NW
Washington, DC 20036
ADLowell@winston.com
(202) 282-5000 (ph)
(202) 282-5100 (fax)

Sofia Arguello
200 Park Avenue
New York, NY 10166
SArguello@winston.com
(212) 294-6700 (ph)
(212) 294-4700 (fax)

*Counsel for Matthew Grimes*

## INTRODUCTION

The government's justification for calling expert witnesses for the highly prejudicial purpose of telling the jury that Defendants are a "threat to national security" is that such witnesses are necessary to respond to an argument from the defense that neither Defendant intends to make and that this Court would not allow.  The government is correct that "Defendants have repeatedly argued that they should not have been prosecuted because their conduct was not 'clandestine' or 'espionage-like' behavior of the sort Section 951 was meant to combat."  (Dkt. 183 at 4; *see id.* ("Grimes has argued that, in its entire history, Section 951 has 'never before been used against a person in Mr. Grimes' position' and instead is reserved for 'spies and others engaged in criminal activity.") (quoting Grimes Mot. to Dismiss (Dkt. 71 at 1).)  But as the government itself recognizes, Defendants made these arguments to the Court in moving to dismiss the indictment, and the Court ruled against that motion.  Nevertheless, the government claims: "Although the Court rejected these arguments in its order denying the motions to dismiss, the government fully anticipates that the Defendants will make these arguments, in various forms, to the jury at trial, suggesting that the Defendants' conduct was not serious, [or] did not implicate national security concerns. . . ."  (*Id.* at 5.)[1]

The government's concerns are overblown.  That Mr. Grimes, for example, might still question how he could knowingly and intentionally have agreed to become an agent of the UAE under Section 951 by editing speeches, helping on trips, or taking the other alleged actions charged in the indictment does not open the door for the government to call an expert to opine on a different

---

[1] The end of the government's sentence includes "and constituted typical business or networking activities."  (Dkt. 183 at 5.)  To be sure, Defendants will argue that they were engaged in typical business activities on behalf of Colony Capital, and not as agents of the United Arab Emirates (UAE), but no such argument would warrant the proposed national security expert testimony.

issue – whether Mr. Grimes was being used as a pawn by some foreign government's intelligence service to harm the national security of the United States.  To be clear, Defendants do not intend to make any sort of jury nullification argument that a violation of Section 951 should be ignored under some "no harm, no foul" theory because there was no damage to national security. Defendants expect the Court to instruct the jury to decide the case based on the law it gives the jury, not to question the wisdom of the law.  (*See* Dkt. 147 at 2 (government requesting these instructions).)  Those instructions will prevent any need for the government to call these experts.

## ARGUMENT

### I.      TESTIMONY BY MICHAEL HIGGINS SHOULD BE EXCLUDED

The government claims that Higgins' testimony is needed to convey that "Defendants' alleged actions at the direction of a foreign government present a substantial national security risk" (Dkt. 183 at 9), but the issue for the jury is whether Defendants acted as agents of the UAE without giving notice to the Attorney General.  The government repeatedly has argued that it is irrelevant what a person does as an agent, and that "[i]f a person acts or agrees to act in the United States as an agent of a foreign government and does nothing else (i.e., fails to provide notice), then he has violated Section 951."  (Dkt. 177 at 8.)  As the government puts it, "it is the act that matters not the content of that act." (Dkt. 80 at 50.) Section 951 applies to agents of all foreign governments, including our closest allies and agents who take actions that benefit the United States. Consequently, no showing of harm to national security is required to prove a Section 951 violation, and any effort by the government to paint Defendants as "a substantial national security risk" is irrelevant and highly prejudicial.

The government again claims that Higgins' testimony is needed to rebut an argument from the defense that the jury should find "Defendants not guilty based, in part, on the purported

insignificance of the steps they are alleged to have taken on behalf of the UAE," but again Defendants will not argue to the jury that any violation of Section 951 should be ignored as insignificant.  (Dkt. 183 at 9.)  Defendants have the right to explain their conduct and why they did not agree to become agents of a foreign government.  That does not open the door for the government to change the subject to national security risks irrelevant to the jury's determination.

Higgins' testimony is also irrelevant, given its scope.  The government wants Higgins to testify about how *some* foreign intelligence services operate in the United States, in the abstract, but as the government now admits, Mr. Higgins will not testify "specifically about the UAE or KSA [Kingdom of Saudi Arabia] or about the conduct of the Defendants or their co-conspirators or about their respective mental states," nor is he "expected to testify specifically about the conduct of the UAE or KSA governments in this case, nor about the specifics of either country's national security or historical intelligence operations." (*Id.* at 7, 13.) Consequently, none of this testimony is relevant at all.[2]  If Higgins cannot testify as to what either foreign governments or Defendant in this case did in the specific allegations in this indictment, his testimony has no bearing on anything. It is utterly immaterial whether *some* country, *somewhere*, engages in a particular intelligence tactic, if there is no connection to the country (the UAE) that is actually the subject of the charges.

It is baffling that the government addresses case law in which expert testimony is admitted to explain the "intent with which certain acts were performed," when that has nothing to do with

---

[2] Because Higgins' proposed testimony has nothing to do with anyone involved in this case, it simply is not relevant.  But, as Defendants previously explained, Rule 404(b) would preclude Higgins from essentially arguing that what Defendants or the UAE allegedly did here fits some profile and therefore they must be guilty.  The government is correct that "expert testimony that does not address the conduct of any defendant or co-conspirator or even any particular foreign government could [not] come within the ambit of Rule 404(b)," but Higgins' testimony about what some *other* foreign governments do cannot come within Rule 401 as it is no more relevant than calling an expert in a tax case to testify that some other people cheat on their taxes. His testimony does not assist the jury in deciding the charges before it.

what the government's proffered expert testimony would do.  (*Id.* at 9 (quoting *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997)).)  How third-party foreign intelligence services operate—and not even the foreign intelligence services allegedly relevant to this case operate—says nothing about *Defendants*' intent.  The cases cited by the government address circumstances where a defendant is engaged in conduct that a jury may not understand.  *See United States v. Kampiles*, 609 F.2d 1233, 1247 (7th Cir. 1979) (explaining that a former CIA officer's confession to selling classified material to Soviet intelligence officers was corroborated by expert testimony that defendant's use of signals to meet at pre-arranged locations was consistent with Soviet intelligence practice); *United States v. You*, 534 F. Supp. 3d 880, 884 (E.D. Tenn. 2021) (allowing expert testimony on China's use of government awards programs to incentivize the theft of trade secrets in a case where such programs were used to steal trade secrets); *United States v. Atilla*, 15 Cr. 867 (RMB), Dkt. No. 357 (S.D.N.Y. Nov. 22, 2017) (admitting expert testimony regarding how Iran uses various entities to launder money in a case where those entities were used to launder money for Iran); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 532 (E.D.N.Y. 2012) (allowing the defense to introduce expert testimony that Hamas often falsely claims responsibility for terrorist acts to rebut a claim that Hamas admitted to committing a terrorist act and defendant was liable for aiding Hamas); *United States v. Banki*, 2010 WL 2076770, at *2 (S.D.N.Y. May 25, 2010) (admitting expert testimony regarding moving money through a hawala trade system).  Each of these cases involved expert testimony that was tied to the specific facts of the case and explained actions taken by the defendants themselves that a jury may not otherwise understand.

This case is not as complicated as the government wants to make it.  The struggle the government is going to have at trial is proving that Defendants agreed to be agents under the control of the UAE.  The focus will not be on what Defendants did, but the reason that they took

those actions.  More specifically, the question is whether Defendants took those actions as part of their agreements to be agents of the UAE, under the UAE's direction and control, or whether they took those actions for reasons of their own.  Higgins' proposed testimony will not help the jury answer that question.  Not only does his testimony admittedly shed no light on Defendants' motives or intent, but he will also not even testify about the intentions of the supposed principal here, the UAE.

Nor is this a case where the conduct is at all confusing, or that requires expert testimony to explain, such as spy craft signals to meet.  There is no meaningful debate here over what actions Defendants took or that those actions were supported or even requested by the UAE.  A jury will understand, for example, that if the UAE requested an editorial change to a speech, article, or paper, the change was something that the UAE wanted.  There is no reason for the jury to be inundated with expert analysis to understand why the UAE may have wanted the change.

The prejudice to Defendants that will inure from Mr. Higgins' testimony is real and substantial.  Mr. Higgins' plan to talk in generics about ████████████████████ ██████████████████████ is, as Defendants pointed out in their opening motion, so wide-ranging and unspecific that it covers nearly every imaginable interaction between two persons of different countries.  (*See* Dkt. 164-1 at 10) (describing Higgins' expected testimony that ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████ ).  It is hard to imagine a single scenario that Mr. Higgins would describe as outside the range of conduct that "foreign intelligence" engages in, which makes some sense because there are nearly 200 different countries on this planet, and if the intelligence operations of every one of

them are added together and then lumped into one big jumble, the range of potential conduct will be, admittedly, vast. But without connection to the actual country at issue here—the UAE—this testimony is unbelievably prejudicial and misleading because it suggests to the jury that the UAE operates, and has operated, in a manner that may well be outside the type of conduct *actually* engaged in by the UAE.

The government does not even try to hide the real reason that it seeks to introduce this evidence: it is not to prove intent, but to prove damages in a case where proof of damages is unnecessary. The government wants the jury to "see how the Defendants' alleged actions at the direction of a foreign government present a substantial national security risk." (Dkt. 183 at 9.) Not only is such expert testimony irrelevant to proving intent, but it is also not needed to rebut an imaginary claim by the defense, which will not be made, that the jury can ignore actual violations of Section 951 if they are harmless. Rather, Defendants' argument at trial will be that their conduct did not violate Section 951 at all because they never agreed to become or acted as agents of the UAE. Thus, the government is simply trying to show the jury that there are hostile intelligence agencies in the world that are out to harm the United States and claim Defendants joined their efforts and posed a "substantial national security risk." (*Id.*) None of this evidence goes to the government's burden of proof, and its admission would unfairly smear Defendants and prejudice them in the eyes of the jury. *See United States v. Lachman*, 48 F.3d 586, 592 (1st Cir. 1995) (where the government does not need to prove a national security threat to establish the elements of the crime, evidence that suggests that such a threat existed as a result of defendants' actions is more prejudicial than probative and thus, inadmissible).

## II.      TESTIMONY BY CHRISTOPHER DAVIDSON SHOULD BE EXCLUDED

Much of Davidson's testimony on the history and politics of the Middle East and autocratic rule of the KSA and UAE is inadmissible for the same reason.  It does not help the jury answer any question that will come before it and it is designed to unfairly prejudice Defendants.  The government acknowledges that "Dr. Davidson is not expected to provide testimony about the conduct of the Defendants in this case, nor will he comment on any defendant's state of mind." (Dkt. 183 at 16.)

In particular, there is no basis to introduce Dr. Davidson's opinions regarding KSA, including that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████. (*See* Dkt. 164-1 at 12–13.)  As explained in Defendants' opening motion, opinions about the KSA are particularly irrelevant because Defendants are not alleged to have acted as KSA agents, but only as agents of the UAE.  (*See id.* at 13–17.)

The government does not contest that opinions (3), (4), and (5) are irrelevant.  But it responds by touting Dr. Davidson's credentials (*see* Dkt. 183 at 16)—as if publication quantity is the measure for relevancy—and insisting on the relevance of KSA politics.  Specifically, they say that Dr. Davidson will testify that, during the relevant time period, the UAE and KSA were closely

aligned and coordinated in their foreign policy objectives. (*Id*. at 17.) But Defendants are alleged to have agreed to operate subject to only the *UAE*'s direction and control. As a result, what matters for purposes of the Section 951 charges is whether Defendants agreed to follow only the UAE's directives. Whether or not those happened to align with the KSA's objectives is immaterial. And while the government notes that the KSA is mentioned in several communications referenced in the indictment (*see id*. at 17–18), it does not explain why the jury would need to know the workings of the KSA government to understand the import of these communications. Indeed, the government apparently wants Davidson to testify that the UAE and KSA are dictatorships and "closely aligned" politically, and perhaps remind the jury of what it likely already knows about the suspected involvement of some in the KSA with the 9/11 terrorist attack on the United States (which Davidson will address) or its alleged involvement in the murder of Jamal Kashoggi. (*Id*. at 17.) This highly inflammatory and irrelevant evidence would portray Defendants as taking efforts on behalf of totalitarian governments that do not share our democratic values and suggest that they had aligned with these foreign governments to threaten the United States. There is no basis for this evidence, and its prejudice far outweighs any remote probative value.

Much of Davidson's testimony about the UAE is also unnecessary. The jury does not need to know why the UAE asked for anything from Defendants; rather, the government is merely arguing that evidence that Defendants did what the UAE asked is consistent with Defendants being agents of the UAE. Why the UAE may have needed this assistance is of no more relevance than asking in a bank robbery case what the defendants planned to do with the stolen money.

The government seeks Davidson's testimony to prove damages, that Defendants aided "the KSA and the UAE's efforts to increase their collective influence in the United States, as well as the efforts of the UAE to promote and elevate MBS, through the direct efforts of the Defendants

and their co-conspirators." (*Id.* at 18.)   Admittedly, the government says that Davidson's testimony will "cover sensitive or controversial foreign policy issues and the autocratic and authoritarian nature of the UAE and KSA governments." (*Id.* at 20.)  But as nefarious as that all sounds, none of it is needed to prove any charge in this case.  Section 951 does not require the government to prove any national security harm resulted or was intended.  The government offers this gratuitous evidence to impugn Defendants, and that puts Defendants in the difficult position of having to devote their trial resources to defending against this red herring of a smear rather than focusing exclusively upon defending against the actual charges.

The government accuses the defense of attempting to "whitewash" the facts and claims that Davidson's testimony addressing such tangential matters as the 9/11 attacks is relevant because "the jury may not understand the nature of the Declassified Pages as they are referenced in the evidence," but the government mistakes this trial for some kind of doctoral level course on contemporary politics of the Middle East. (*Id.* at 20, 23.)  The purpose of the trial is to decide whether Defendants agreed to act as agents of the UAE without giving notice, not to ensure that the jurors walk away from trial with an understanding of the respective efforts of the UAE and/or the KSA to preserve their authoritarian governments, or the history of human rights and other abuses those countries have, or are alleged to have, committed.  The only fact relevant to the jury's determination of agency is what, if anything, the UAE requested Defendants to do and whether Defendants agreed to take those actions as agents of the UAE.  Lacking actual evidence that Defendants were agents of the UAE, the government seeks to improperly prove guilt by associating Defendants with unpopular foreign governments and the unpopular things those countries do, and letting the ensuing prejudice dictate the verdict.

## III.   ELIOT KALTER'S TESTIMONY SHOULD BE LIMITED

Defendants do not object to Mr. Kalter offering limited testimony by way of background on sovereign wealth funds, as his proposed testimony has been narrowed by the government, but Defendants emphasize that such testimony should be limited. Juries may not be familiar with the fact that foreign governments often act as investors through sovereign wealth funds, but they do understand the basics of how investments work and why companies, like Colony, seek out clients for investments. There is no reason for this testimony to be extensive.

### CONCLUSION

The Court should preclude the testimony of Higgins, and limit the testimony of Davidson and Kalter as requested.

Dated: September 7, 2022                    Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP          O'MELVENY & MYERS LLP

/s/ Michael S. Schachter                    James A. Bowman (admitted *pro hac vice*)
Michael Steven Schachter                    400 South Hope Street, 18th Floor
Randall Wade Jackson                        Los Angeles, CA 90071
Steven J. Ballew                            jbowman@omm.com
787 Seventh Avenue                          (213) 430-6000 (ph)
New York, NY 10019-6099                     (213) 430-6407 (fax)
mschachter@willkie.com
(212) 728-8000 (ph)
(212) 728-8111 (fax)

*Counsel for Thomas J. Barrack, Jr.*

WINSTON & STRAWN LLP

/s/ Abbe David Lowell
Abbe David Lowell, Bar No. 358651DC         Sofia Arguello
Christopher D. Man, Bar No. 453553DC        200 Park Avenue
1901 L Street, NW                           New York, NY 10166
Washington, DC 20036                        SArguello@winston.com

ADLowell@winston.com                    (212) 294-6700 (ph)
(202) 282-5000 (ph)                     (212) 294-4700 (fax)
(202) 282-5100 (fax)


*Counsel for Matthew Grimes*

**CERTIFICATE OF SERVICE**

I certify that on September 7, 2022, a copy of the foregoing was filed with the Court's

electronic case filing system, thereby effecting service on counsel for all parties.

/s/ *Abbe David Lowell*
Abbe David Lowell